OWOSSO SUGAR CO. *v.* ARNTZ.

1. CORPORATIONS—MINNESOTA FOREIGN CORPORATIONS ACT—EXEMPTIONS.

A Michigan corporation, organized for the purpose of growing, purchasing, and dealing in sugar beets, and incidentally engaged in raising and selling live stock, is within the exception of the Minnesota foreign corporations act (Gen. Stat. Minn. 1913, § 6208) relating to such corporations, and therefore its right to recover for the fraud of its agent in selling stallions in Minnesota is not affected by its failure to comply with the provisions of said act.

2. SAME—MINNESOTA STATUTE NOT APPLICABLE TO ACTION IN MICHIGAN BY MICHIGAN CORPORATION.

Failure of a Michigan corporation to comply with the provisions of the Minnesota foreign corporations act may not be urged as a defense to an action in Michigan to recover for the fraud of its agent in Minnesota by padding his expense account.

3. ALTERATION OF INSTRUMENTS—BILLS AND NOTES—MATERIAL ALTERATIONS—PRINCIPAL AND AGENT.

An agent's erasures of interest and acceleration provisions, and words "standing colts or no pay," from notes taken in payment for certificates entitling the makers to services of stallions for breeding purposes, were material alterations, but, if made without the principal's knowledge or consent, did not render the note void and uncollectible so as to entitle the principal to recover from the agent the unpaid portions thereof, but were still enforceable against the makers according to their terms before the erasures were made.

4. SAME—ALTERATION BY AGENT TEMPORARILY IN POSSESSION IS MERE SPOLIATION.

One who procures a writing as an agent and holds it temporarily for transmission to his principal is a stranger within the meaning of the rule that the changing of a written instrument by a stranger is a mere spoliation.

5. SAME—AGENT NOT PRESUMED TO HAVE AUTHORITY TO CHANGE.

Nor will an agent be presumed to have authority to make a change in an instrument from the mere fact that he is authorized to receive the instrument or to deliver it to another.

6. APPEAL AND ERROR—ERROR ADOPTING WRONG RULE OF DAMAGES PREJUDICIAL.

Error of the trial judge in holding that defendant agent's alterations of notes without the knowledge or consent of his principal rendered them wholly void, was seriously prejudicial, because it resulted in the adoption of a wrong rule of damages.

7. PRINCIPAL AND AGENT—AGENT ALTERING NOTES IS LIABLE TO PRINCIPAL TO AMOUNT OF DAMAGE.

An agent who altered notes without the knowledge or consent of his principal is liable to the principal in damages to the extent that the principal failed to collect or was unable to collect because of said alterations.

8. SAME—AGENT LIABLE TO PRINCIPAL FOR FULL AMOUNT OF FORGED NOTES HE INDUCED PRINCIPAL TO ACCEPT.

A principal may recover from an agent the full amount of forged notes which the agent fraudulently induced the principal to accept in payment for property sold by the agent.

9. SAME—WAIVER—DAMAGES.

A principal obtaining part payment of notes fraudulently altered by its agent did not thereby waive its right to recover from the agent its damages sustained by the fraud.

10. SAME—PRINCIPAL NOT REQUIRED TO FIRST SUE MAKERS OF NOTES ALTERED BY AGENT.

A principal obtaining part payment of notes fraudulently altered by its agent may sue the agent for damages thus sustained without first bringing actions against the makers.

11. SAME—GENUINENESS OF SIGNATURE TO NOTE JURY QUESTION.

Where there was a direct conflict in the testimony as to whether the signature on a note which an agent induced his principal to accept for property sold was genuine, the question was one for the jury.

12. SAME—WHETHER AGENT CAUSED FICTITIOUS NOTE TO BE MADE JURY QUESTION.

Whether a note, signed by a man of the same name as the signer of a genuine note, was executed by the agent for the

purpose of fraudulently inducing his principal to accept it, *held,* properly submitted to the jury under the evidence.

13. Same—Genuineness of Receipts Jury Question.

The genuineness of two receipts purporting to have been given to an agent for services rendered and charged to the principal, *held,* for the jury under the evidence.

14. Same—Principal Entitled to Money Given Agent in Payment of Destroyed Note Although Maker Did Not Avail Himself of Services Paid for.

Where the maker of a note given for the services of a stallion for breeding purposes, as evidenced by a breeding certificate, unlawfully obtained and destroyed the note but later paid the money to the agent, the principal was entitled to such money, although the maker did not take advantage of his right to the services contracted for.

15. Same—Whether Agent Turned Over Amount Received for Destroyed Note Jury Question.

Whether an agent, receiving money for a destroyed note given for a breeding certificate, turned the money over to another, who took out an additional certificate, *held,* properly submitted to the jury under conflicting testimony.

16. Same—Good Faith of Agent in Sending Note to Principal Jury Question.

Whether an agent acted in good faith in sending to his principal a note given for $120 pursuant to the original agreement of the maker to take a breeding certificate for six colts, when in fact the contract was later changed to two colts only, *held,* for the jury under the evidence.

17. Same—Commissions—Fraud—Damages.

In a principal's action against its agent for fraud incident to the sale of certain stallions, a deduction of 15 per cent. commission due the agent should have been made, instead of allowing the principal to recover the full amount of altered or forged notes, which the agent induced it to accept.

Error to Kent; Perkins (Willis B.), J. Submitted June 20, 1928. (Docket No. 74, Calendar No. 32,605.) Decided October 1, 1928.

Case by the Owosso Sugar Company against William L. Arntz for fraud. Judgment for plaintiff. Defendant brings error. Reversed.

*Charles H. Goggin* and *Smith, Hunter & Spaulding*, for appellant.

*Martin H. Carmody*, for appellee.

North, J. The plaintiff, a Michigan corporation, seeks by this suit to recover damages which it is alleged to have sustained in consequence of the fraudulent conduct of the defendant while acting as its agent incident to the sale of 13 pure bred Belgian stallions. The plaintiff recovered a judgment for $2,672, and the defendant is reviewing by writ of error.

The plaintiff was incorporated in 1902 for the following purposes:

"To grow, purchase, and deal in sugar beets and to make sugar and other products therefrom and to sell and deal in such products."

It operated two large plants where it manufactured beet sugar, and became the owner of Prairie farm near Chesaning, Michigan, consisting of 9,800 acres. Primarily this land was used to produce sugar beets, but as a necessary incident to the successful operation of this farm other crops were also produced on a large scale, and pure blooded horses, cattle, sheep, and hogs were raised. In 1920 the plaintiff possessed on this farm approximately 80 thoroughbred Belgian stallions, mares, and colts. At this time negotiations between the parties to this suit resulted in the defendant being engaged by the plaintiff as its agent to undertake the sale of a number of these Belgian stallions. The defendant had had previous experience of this character. He was

given a very large range of authority, even to the extent of fixing the price to be obtained for each horse, subject, however, to the approval of the plaintiff. After some consultation the parties decided the horses could be advantageously disposed of in the State of Minnesota under the following plan: The defendant would seek a location where it seemed probable that a horse of this type might be placed, and, with the assistance of a helper who knew the people of that community, canvass the resident farmers and sell "breeding certificates" to those desirous of raising colts, which would entitle them to have the service of the stallion to be placed in that community at the rate of $20 for each "standing colt" obtained from such service. In payment for this prospective service the purchaser gave his promissory note payable to the plaintiff in three equal annual instalments, each note being for such an amount as the breeding certificate purchased by the maker came to at $20 per colt. When notes of this character aggregating the price asked for the horse were obtained in a given community, the animal was placed with a custodian under a sales agreement which provided that such custodian was to "fully carry out and perform all the breeding contracts in force and effect  *  *  *  with relation to the" stallion placed with him. By the performance of this condition of the sales agreement, the custodian became the owner of the horse. The plaintiff agreed that in case a horse died within three years it would be replaced by it by another of the same breed and value.

The plaintiff provided the defendant with printed forms to be used for these breeding certificates, the promissory notes, and the sales agreements. The defendant was to have his expenses paid, including

the cost of a helper, and was to receive as his compensation 15 per cent. of the net amount received for each stallion. Each sale was reported by the defendant to the plaintiff as a separate transaction, and the expenses incident to it were deducted and the defendant's commission computed on the net result and paid to him. It is the claim of the plaintiff that the defendant falsely reported to it the amount he had expended for a helper incident to the sale of each of 12 stallions, and that he forwarded to it receipts purporting to be signed by the respective helpers for the amounts which the defendant claimed he had so expended, which receipts were for larger amounts than were actually paid; in some instances such receipts were claimed by the plaintiff to be wholly fictitious; and the plaintiff alleges that by so doing the defendant wrongfully and fraudulently obtained from it $1,070, which, together with lawful interest thereon, the plaintiff now seeks to recover. It is also claimed by the plaintiff that certain of the notes taken in payment for the breeding certificates were altered by the defendant after their delivery to him and before they were forwarded to the plaintiff; that in some instances such notes were forged by the defendant; and that by means of such alterations and forgeries the defendant fraudulently and wrongfully caused the plaintiff to accept in part payment for certain of its horses notes which are either wholly or partially uncollectible to its damage and loss. Further details of the plaintiff's claim will be stated hereinafter. The defendant denies the various charges made against him. In his brief the assignments of error are grouped under seven heads, which we will follow in considering the case.

1. The appellant claims the plaintiff's failure to

comply with the laws of Minnesota relative to foreign corporations doing business in that State prevents recovery by it in this suit and the circuit judge erred in holding otherwise. There is no occasion for quoting at length herein from the so-called Minnesota foreign corporation act. It is admitted by the plaintiff that at the time of the transactions herein involved it had not complied with the requirements of the act, and that as a foreign corporation it was doing business within the State of Minnesota, but the plaintiff asserts that it comes within a class of corporations which is excepted from the statute by the following provision:

"Provided, further, that none of the provisions hereof shall apply to or in any manner affect corporations organized for the purpose of raising and improving live stock, cultivating or improving farms or gardens or horticultural lands or for growing sugar beets." * * * Gen. Stat. Minn. 1913, §6208.

As stated at the outset in this opinion, the plaintiff company is a corporation organized "to grow, purchase, and deal in sugar beets." The record shows that it is not only organized for this purpose but that primarily it is actually so engaged, and the production of other crops and the raising and selling of live stock is merely incidental to the successful carrying on of the principal pursuit for which the plaintiff is incorporated. It may be noted in passing that the kind of business actually transacted by the plaintiff within the State of Minnesota might well be said to come within the express exception to the statute covering corporations organized "for the purpose of raising and improving live stock." We are of the opinion that the plaintiff company is within the exception of the Minnesota statute, and that the circuit judge correctly held

the plaintiff's right to recover, if any, was not affected thereby. Entirely apart from the foregoing determination, it is clear that failure to comply with the Minnesota statute could not be urged as a defense to a suit brought in a Michigan court for the purpose of recovering money which the defendant had fraudulently obtained from the plaintiff by means of padding his expense account.

2. It is asserted by the appellant that the trial court erred in holding certain alleged alterations made by the defendant in some of the notes taken in payment for breeding certificates were material alterations, and because thereof these notes became invalid and uncollectible and rendered the defendant, Arntz, liable to the plaintiff for the amount of such notes. As stated above, these notes were taken by Mr. Arntz on printed forms provided by the plaintiff. They contained a provision for "interest at 7 per cent. per annum," and also an acceleration clause (referred to in the record as a penalty), which provided that in case of default in the payment of any part of the principal or interest for 30 days or more the whole note immediately became due and payable. In some instances the defendant, in accordance with the demand of the maker of the note, struck out one or the other, or both of these provisions by drawing a pencil mark through them. On others of these notes he wrote, at the request of the maker, "standing colts or no pay," meaning thereby unless a colt was obtained which was strong enough to stand the note should not be binding as to such service. It is claimed by the plaintiff that before the notes were forwarded from Minnesota to its home office in Michigan, and without its knowledge, the defendant erased from these notes the alterations he had made thereon. The defendant denies

the erasures and claims he sent the notes to the
plaintiff in the form in which he accepted them from
the respective makers.   The circuit judge properly
held that if such erasures were made by the defend-
ant they constituted material alterations; but he
also held that such alterations rendered the notes
void and wholly uncollectible, and that because
thereof the plaintiff was entitled to recover from
the defendant the unpaid portion of any such altered
note.   This ruling was erroneous.   If these altera-
tions had been made by the plaintiff or by any of its
agents or servants with its knowledge or consent
the notes would thereby have been rendered void
and uncollectible; but if, as the plaintiff here con-
tended, these notes were thus altered by the defend-
ant without the knowledge or consent of the plaintiff
the instruments were not thereby rendered void, but
instead were still enforceable by the plaintiff in ac-
cordance with the terms and conditions before any
erasures were made, i. e., in the form in which they
were signed by the respective makers.   The plain-
tiff's right to enforce the notes as originally ex-
ecuted was not affected by the fact (if such was the
fact) that the alterations were produced by wrong-
ful acts of the plaintiff's agent so long as the plain-
tiff was in no way a party thereto.

"Where the change is made by one who is or was
the agent of one of the parties, but without any au-
thority from the principal, either express or implied
from the circumstances, to make any change, and
the matter is outside the scope of his particular em-
ployment, the act is generally considered to be a
mere spoliation, and has no effect upon the instru-
ment or the rights and liabilities of the parties
thereto, unless the alteration is ratified by the prin-
cipal.   Thus one who procures a writing as an agent
and holds it temporarily for transmission to his

principal is a stranger within the meaning of the rule that the changing of a written instrument by a stranger is a mere spoliation." 2 C. J. p. 1236.

See, also, *White Sewing Machine Co.* v. *Dakin,* 86 Mich. 581.

"Nor will an agent be presumed to have authority to make a change in an instrument from the mere fact that he is authorized to receive the instrument or to deliver it to another. In such cases an agent is considered to be in the same position as any other stranger to the instrument, and his act in altering it amounts to a spoliation and no more, unless subsequently adopted and ratified by his principal." 1 R. C. L. p. 985.

The error of the trial judge in holding that the alterations here charged against the defendant rendered the notes wholly void was seriously prejudicial because it resulted in the adoption of a wrong rule of damages. At least in several instances the plaintiff appears to have made little or no effort to collect these altered notes from the makers; and the trial court held that any amount unpaid on such a note might be included in the verdict and judgment against this defendant. The rule of damages should have been this: To the extent that the plaintiff failed to collect or was unable to collect any note because it was altered by the defendant without the knowledge or consent of the plaintiff, the defendant should be held liable in damages to the plaintiff. For example, if the defendant struck out the interest clause so that a note as it was taken was noninterest bearing and later by erasure reinstated the provision requiring the payment of interest, and by this deceit and fraud caused the plaintiff to lose the interest, to that extent he should be held liable to the plaintiff for the loss this fraud caused it to sustain.

But, if the plaintiff was unable to realize on some of these notes because the makers had become uncollectible or because of any other circumstance not due to the defendant's fraudulent conduct charged in the declaration, it cannot make that a ground of recovery in this case. It is claimed by the plaintiff that two of the notes forwarded to it by the defendant were forgeries. We shall later consider whether there was any testimony tending to sustain this charge. If there was, then it would follow that as to such forged notes which the defendant fraudulently induced the plaintiff to accept in payment for its property, the measure of recovery would be the full amount of the forged notes.

3. The defendant asserts there was error committed by the trial court in holding that the acceptance of payment in full of some of the notes taken in these transactions and the acceptance of part payment of others did not constitute a waiver of the plaintiff's present claim of a right to collect from the defendant the amounts unpaid on the altered notes; and at least that there was error in allowing the plaintiff to prosecute such claims against the defendant before any attempt was made to collect from the respective makers of the notes. As hereinbefore stated, there was error in allowing recovery for the full amount of the altered notes; but the fact that the plaintiff has obtained part payment on some of these notes which were good as against the makers as they were originally drawn, certainly cannot constitute a waiver of the plaintiff's right to recover for damages it has sustained because of the defendant's fraudulent alteration of these instruments. It surely is somewhat inconsistent to assert that there has been a waiver in those cases where the plaintiff has obtained partial payment and also claim that

the plaintiff cannot maintain this suit until it has sought to force collection of the respective notes by bringing actions against the makers. We find nothing in this record which constitutes a waiver or works an estoppel as to the plaintiff's right to maintain this action against the defendant.

4. Error is claimed because the trial court submitted to the jury the question of forgery incident to certain notes and receipts which the defendant forwarded to the plaintiff, it being asserted by the defendant that there was no testimony in support of this charge. This issue was raised concerning two notes, one signed "H. T. Peterson" and the other "John Kostrebo;" and also as to two receipts, one signed "Fred Bellen," and the other "Rupert S. Tulford."

The record clearly shows a direct conflict in the testimony as to whether the signature on the Peterson note is genuine, and it became a question of fact for the jury. This is practically conceded in the defendant's brief. As to the John Kostrebo note, the record discloses that there was a man by that name who gave his note for $120 in payment of a breeding certificate, but this note was signed by the maker's mark and was paid to the plaintiff. The Kostrebo note alleged to have been forged was for $180, and the defendant claims it was given by another man by the same name who lived about 20 miles from the other Kostrebo. Depositions were taken in that locality for use at this trial, and at that time the defendant was there, but was unable to locate a second John Kostrebo who was the maker of the note in question, nor did the defendant at any time produce any witness other than himself who had ever known of such a man in that locality. The men who assisted the defendant in selling the breeding cer-

tificates in this territory were witnesses for the
plaintiff, and they testified that they had no recol-
lection of a transaction with any John Kostrebo ex-
cept the one who could not write and who signed
his note by making his mark. For the purpose of
collecting moneys due on its notes, the plaintiff's
manager went to Minnesota and interviewed various
persons involved in these transactions. Relative to
this John Kostrebo note he testified:

"In trying to locate the other John Kostrebo I
went to the post office, every bank in the vicinity
around there, and every place of business and made
inquiry and asked if they ever knew John Kostrebo.
Then I went back to John Kostrebo (who signed by
his mark) and I made inquiries throughout the com-
munity. I was accompanied by Roy Dobble, the
custodian of the two horses. I did not find any trace
of John Kostrebo other than the one who signed
with the cross except a boy about 12 years old."
\* \* \*

There is other testimony in the record which
clearly tends to raise the question as to whether
there was a second man bearing the name of John
Kostrebo involved in these transactions or whether
this note, as claimed by the plaintiff, was one which
the defendant had caused to be executed for the pur-
pose of fraudulently inducing the plaintiff to accept
it in part payment of one of its horses. In arriving
at this conclusion we have not overlooked the de-
fendant's claim that the territory covered was some-
what extensive, that, incident to the sale of 13 stal-
lions, approximately 500 notes were taken, aggre-
gating substantially $40,000, and that the various
transactions occurred three or four years before
suit was brought; but these circumstances had to do
only with the weight of the testimony which seemed

to disclose an inability to locate or account for the John Kostrebo who the defendant claims was the maker of the note in question.

In some particulars the testimony as to the receipts which the plaintiff claims were forgeries is somewhat similar in character to that given incident to the Kostrebo note. These receipts purport to have been given for help in selling two stallions which were placed at Sabeka, Minnesota. One receipt is for $150, and is signed "Fred Bellen." It was given "for helping sell a Belgian stallion at Sabeka, Minnesota." The other is for the same amount, and is signed "A. A. Johnson." This was given "for helping on Belgian stallion  *  *  * Tamboer de Hemel." The defendant admits that neither of these receipts is drawn in accordance with the actual facts incident to which it was given. It appears from the testimony that none of the witnesses, with the exception of the defendant, had ever heard of a man by the name of Fred Bellen who had anything to do with the sale of either of these horses. The defendant testified that Bellen was engaged in the sale of horses for an Iowa company, that he informed the defendant of the locations for the two stallions sold at Sabeka, and that the defendant paid Bellen $75 for each of these locations. He also testified that he was assisted in the sale of both of these horses by Andrew Johnson, and that he paid Johnson $100 for helping with each horse, that he took from Johnson one receipt covering both transactions in the amount of $150, and that he paid the balance of $50 from his own funds. Johnson, who was a witness for the plaintiff, testified that the signature on the $150 receipt was his, but that at the time it was executed by him it was for only $100, and that this was the amount paid him incident to

the sale of the horse named in the receipt. Other facts and circumstances appear in the record which bear upon this phase of the case; and we are of the opinion that the testimony was of such a character as justified the trial judge in submitting to the jury the question of the genuineness of these two notes and the two receipts.

5. The defendant has assigned error on the ruling of the trial judge whereby a transaction referred to in the record as "the Blenkush matter" was submitted to the jury, it being asserted by the defendant that the plaintiff had no interest in or rights arising out of this transaction. Blenkush purchased a breeding certificate for three colts, and gave his note therefor in the sum of $60. Later he obtained possession of this note in an unlawful manner and destroyed it. The defendant and the village marshal, Roy Dobble, pursued Blenkush, and upon overtaking him evidently resorted to some rather persuasive methods whereby Blenkush was induced to pay to the defendant $70, $10 of which was for the trouble and expense Blenkush had caused. The trial court held this constituted a payment of the note and the defendant should be required to account for $60 of the money he so received. As a part of this transaction the defendant indorsed on the back of the certificate held by Blenkush: "Received payment for services in full, W. L. Arntz." Blenkush did not see fit to take advantage of his right to the services contracted for in the breeding certificate, but notwithstanding this circumstance the money which he gave to the defendant Arntz in payment of the note clearly belonged to the plaintiff. The ruling of the court to that effect was correct. The defendant claimed that he turned over the $60 received from Blenkush to Dobble, who thereupon took

out a certificate for three additional colts in the place of the certificate theretofore issued to Blenkush. This testimony was denied by Dobble, and the issue of fact thus presented was submitted to the jury.

6. The defendant also claims it was error to submit to the jury the question of the plaintiff's right to recover $80 incident to the Mike Schmitt contract, because there was no proof to sustain plaintiff's claim. The defendant forwarded to the plaintiff Schmitt's note for $120. It is agreed that Schmitt at first contracted to take six colts at $20 each; but he claims that later it was agreed between himself and the defendant that the contract should be reduced to two colts at $20 each. A second certificate was issued by the defendant to Schmitt for two colts, instead of six. The defendant admits that there was some talk relative to an alteration of the original agreement, but he claims it was not finally consummated and that in good faith he forwarded the note for $120 to the plaintiff. The real issue was whether the defendant did act in good faith in carrying out the original agreement with Schmitt and in so doing sent to the plaintiff the note for $120 to be accepted as a part of the purchase price of one of its horses, or whether the defendant knowingly and with intent to defraud and cheat the plaintiff induced it to accept Schmitt's note for $120 when in fact the contract with him was for two colts only at $20 each. This is the issue presented by the declaration, and the proof was such that the trial judge was justified in submitting it to the jury.

7. Error is alleged on the ground that the trial court in its charge to the jury included certain computations of items claimed by the plaintiff, and that as submitted these items were excessive in amount.

At least as to some items this contention is sustained by the record, but the details need not be discussed because it is improbable that like errors will occur in the event of a retrial of the case. However, because it is not mentioned in the briefs, and to avoid a possible recurrence of the error, it may be noted that as to any amounts recovered by reason of the plaintiff having been induced to accept altered or forged notes, a deduction of 15% commission due the defendant under the terms of his employment should have been made instead of allowing the plaintiff to recover the full amount of such items.

The judgment is reversed, and a new trial ordered. The appellant will have costs of this court.

FEAD, C. J., and FELLOWS, WIEST, CLARK, McDON-ALD, POTTER, and SHARPE, JJ., concurred.